

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOSE BRINGAS AND CARMEN BALDERAS, INDIVIDUALLY AND AS PARENTS AND NEXT FRIENDS OF BRAULIO A. BRINGAS, a disabled minor, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 08 C 435 <br> ) Honorable Wayne R. Andersen <br> ) Magistrate Judge Jeffrey Cole <br> ) <br> ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. PERIODIC PAYMENT

The Government asserted as an affirmative defense an election for periodic payment under Illinois law pursuant to 735 ILCS 5/2-1705. The statute requires that such election must be made by motion not less than 60 days before commencement of trial unless leave of court is obtained. The issue was raised by the Government for the first time, without leave of court, six (6) days before the start of the trial. Even if leave of court had been sought, the Court would not have granted leave because the application of the statute is fairly complicated and would have required the Plaintiffs to potentially change their proofs as to damages at trial on unreasonably short notice. Accordingly, the Plaintiffs' motion to strike the Government's second affirmative defense as to election for periodic payment is granted.

### II. LIMITATIONS

The Government asserted as an affirmative defense expiration of the limitations period under the Federal Tort Claims Act ("FTCA"). Under the FTCA, a claim accrues when the plaintiff knows both the existence and the cause of his injury. *U.S. v. Kubrick*, 444 U.S. 111 (U.S. 1979). Once the claim accrues, a plaintiff has two years to file an administrative claim, or if a complaint is timely filed in state court and removed to the federal court, the claim will be deemed to have been filed as of the filing date of the state court complaint under the "savings provision" of the FTCA. In this case, the Government acknowledged

in its closing argument that the statute of limitations was tolled as of the filing of the state court complaint on January 25, 2007, two years and 13 days after the birth of the child.

The question is when did the parents know of the existence and the cause of his injury? There is no question that Braulio was not breathing at the time of delivery and needed to be resuscitated. He was transferred the same day to the University of Chicago Medical Center and was breathing with the assistance of a ventilator. However, he showed steady improvement and began breathing on his own. On January 26, 2005, James Tonsgard, M.D., pediatric neurologist at the University of Chicago, examined Braulio and wrote: "Exam is quite normal. I looked at CT and there are no clear abnormalities." He was released from the hospital without any medications. The parents testified that while they were certainly aware of Braulio's initial respiratory problem, their son had recovered and appeared to be a completely normal baby when they took him home from the hospital. At the time of discharge, there was no evidence that they were ever told that he sustained brain damage or had cerebral palsy. Indeed, at a routine follow-up office visit on March 8, 2005, Dr. Tonsgard wrote that Braulio "has done amazingly well and the family finds that he is really acting quite normally." Dr. Tonsgard concluded that "he looks really good" and suggested that he see Braulio at 6 months of age. At the next visit, on July 14, 2005, there was some concern as to developmental delay and drop in weight, and referrals were made. It was not until November 15, 2005, when developmental delays persisted, did Dr. Tonsgard diagnose Braulio with cerebral palsy.

Andrew W. Zimmerman, M.D., senior pediatric neurologist at the Kennedy-Krieger Institute, affiliated with The Johns Hopkins University Medical Center in Baltimore, Maryland, explained at trial how the newborn brain is a work in progress, and that the brain develops by making connections. Dr. Zimmerman explained that children such as Braulio who experience lack of oxygen around the time of birth often appear and act completely normally for a period time until the connections that should be made do not occur, which may then manifest themselves, as they did in this case, as atypical development. Robert A. Zimmerman, M.D. (no relation to Andrew W. Zimmerman, M.D.), senior

pediatric neuroradiologist at Children's Hospital of Philadelphia, affiliated with the University of Pennsylvania Medical School, explained at trial how radiologic studies of Braulio's brain demonstrate damage to the basal ganglia and thalami, areas deep within the brain that often do not manifest themselves until many months or even a year or more after birth. The Court finds this medical testimony credible and uncontradicted by any of the Government's witnesses.

Given the advanced state of neonatal medicine today, as noted by the many highly qualified medical experts who appeared in this case, it is not at all unusual for a baby that experiences respiratory problems to spend some time in a NICU. Here, once the baby was discharged home, the parents had every reason to believe that their son had recovered from his initial respiratory problem and had no way of reasonably knowing that their son's brain was injured and that he would ultimately be diagnosed with cerebral palsy.

Both Plaintiffs and the Government submitted cases applying the statute of limitations under the FTCA. After carefully reviewing the law on the subject, there is no doubt that Plaintiffs filed their complaint within the applicable limitations period. The Court finds that the parents did not know nor should have known of the existence and cause of the injury until November 15, 2005, when Dr. Tonsgard expressed concern as to persisting developmental delays and first described Braulio as having cerebral palsy. The two year statute of limitations, therefore, began to run on November 15, 2005, thus making the filing date of January 25, 2007 (a date the Government acknowledges as the filing date) well within the limitations period.

### III. STANDARD OF CARE

A. **Office Exam of January 10, 2005**

Multiple medical experts explained that a "due date" represents the 40th completed week of pregnancy, and a pregnancy that goes beyond the due date is considered to be a "post-date" pregnancy, which carries additional risk to both mother and baby with virtually no benefit to either. Multiple medical experts testified that as a pregnancy continues past the due date, the placenta, which is the organ that


supplies oxygenated blood and nutrients to a fetus, begins to decline in function, a condition described as placental insufficiency or maternal malperfusion. This can lead to a decrease in amniotic fluid, known as oligohydramnios. Without an adequate amount of amniotic fluid to surround and "cushion" the baby, the umbilical cord can be compressed between the fetus and the uterine wall. Umbilical cord compression can disrupt or even cut-off the flow of oxygenated blood to the fetus.

Jeffrey L. Wener, M.D., obstetrician-gynecologist with many years of experience in managing pregnancies and delivering babies, testified that if a pregnancy is permitted to continue past the due date, frequent and careful obstetric surveillance is required to reassure fetal well-being. This would include ultrasound, primarily to determine amniotic fluid levels, and non-stress testing, which by measuring fetal heart rate and variability can reassure fetal well-being.

Carol B. Benson, M.D., professor of radiology at Harvard Medical School and Director of Ultrasound and Co-Director of High-Risk Obstetrical Ultrasound at Brigham and Women's Hospital in Boston, Massachusetts, reviewed the ultrasounds performed during office visits on January 6 and 10, 2005. Dr. Benson determined that the ultrasound on January 6, 2005 was improperly performed and interpreted as showing a normal amount of amniotic fluid, when in fact some of the images were incorrectly taken of areas outside of the uterus and those within showed low amounts of amniotic fluid. Dr. Benson also reviewed the ultrasound performed by Dr. Kosanovich on January 10, 2005, when Mrs. Bringas was 41 weeks and 1 day pregnant, meaning she had begun the 42nd week of her pregnancy. Dr. Benson testified that that ultrasound was also improperly performed and interpreted as within normal limits, when in fact the images show almost no amniotic fluid surrounding the baby, a condition she described as severe oligohydramnios. Dr. Benson was asked whether such a misinterpretation can occasionally occur, and she testified that it should not and characterized the misinterpretation as a "wow" deviation from the standard of care.

Dr. Wener, the obstetrician, testified that the standard of care for a post-date patient with severe oligohydramnios requires immediate admission to the hospital with continuous fetal monitoring

and induction of labor. He testified that the most immediate concern would be compression of the umbilical cord.

In this case, Dr. Kosanovich improperly performed and interpreted the ultrasound during his office exam on January 10, 2005. Rather than appreciating the severe oligohydramnios and admitting Mrs. Bringas to the hospital, he instructed her to go home and report to the hospital the following evening, January 11, 2005, for induction of labor overnight and an anticipated delivery the morning of January 12, 2005. The Court finds this to have been a substantial deviation from the standard of care. It should be noted that the Government presented no evidence that Dr. Kosanovich complied with the standard of care.

B. **Labor and Delivery Admission of January 11, 2005**

Mrs. Bringas presented as instructed to Mercy Medical Center the evening of January 11, 2005 and was placed on a fetal monitor at approximately 11:30 p.m. After about an hour, the monitor showed a significant drop in the baby's heart rate, described as bradycardia, which is a sign of fetal distress. In response, hospital personnel declared an emergency cesarean delivery, or C-section, at approximately 12:30 a.m. The resident physician at the hospital was on the telephone with Dr. Kosanovich, who instructed the hospital personnel to prepare Mrs. Bringas for the emergency C-section and to wait for him to arrive at the hospital. Medical records show that Dr. Kosanovich, who lived down the street from the hospital, arrived at the hospital by approximately 12:50 a.m. He instructed anesthesia personnel to attempt regional spinal anesthesia instead of general anesthesia, which was attempted three times but failed. Dr. Kosanovich then called for general anesthesia, and abdominal incision was made at 1:08 a.m. with delivery of the baby at 1:16 a.m.

Dr. Wener testified that in the setting of a Level II+ perinatal center such as Mercy Medical Center, which has an attending obstetrician as well as obstetrical residents in the labor and delivery unit at all times, the standard of care required the emergency C-section to be performed within 15-20 minutes. Dr. Wener testified that taking more than 45 minutes to deliver the baby following the

5

*Findings of Fact and Conclusions of Law*

bradycardia and declaration of an emergency was an unacceptably long time outside of the standard of care.

Also, Dr. Wener testified that in an emergency due to fetal bradycardia, requesting that the anesthesiologist attempt a spinal block anesthesia rather than proceeding immediately to general anesthesia wasted valuable time and was a deviation from the standard of care.

Finally, Dr. Wener noted that once the abdominal incision was made, it took Dr. Kosanovich 8 minutes to deliver the baby. Dr. Wener testified that the standard of care requires delivery 2-3 minutes after incision, and that 8 minutes in this setting was completely unexplained and outside of the standard of care.

The Government presented no witnesses to contradict the Plaintiffs' testimony as to deviations from the standard of care.

The Court finds that once an emergency C-section was declared, the baby should have been delivered within 15-20 minutes, and Dr. Kosanovich's delay in delivering the baby more than 45 minutes after the emergency was declared was a substantial violation of the standard of care.

## IV. CAUSATION

The Plaintiffs claim that the failure to deliver the baby following the office visit on January 10, 2005 or in a timely fashion following the bradycardia in the hospital on January 11, 2005 caused lack of oxygen to the baby which injured his brain and resulted in cerebral palsy. The Government claims that the real cause of the cerebral palsy was fetal inflammatory response syndrome ("FIRS"), a process by which a fetus' response to infection or other trigger results in an inflammatory response to the inciting agent that can result in damage to the brain.

Plaintiffs presented multiple medical experts who testified that the cause of the injury in this case was lack of oxygen due to umbilical cord compression. Carol B. Benson, M.D., the obstetric radiologist, testified that in one of the images from the January 10, 2005 ultrasound, one can actually see the umbilical cord being partially compressed between the baby's shoulder and the uterine wall. As counsel

for the Plaintiff pointed-out during closing argument, it is rare to have an actual picture of the mechanism of injury.

Theonia K. Boyd, M.D., placental pathologist at Children's Hospital Boston and professor of pathology at Harvard Medical School, examined tissues from Mrs. Bringas' placenta and described finding pathologic evidence of placental aging and malperfusion, as well as umbilical cord compression. Dr. Boyd described finding dilatation, or expansion in the size of some of the major branches of the umbilical vessels. She described that when the umbilical cord is compressed, blood "backs-up" into the placenta and stretches or expands the branches of the umbilical vessels, and the finding in this case is pathologic evidence of umbilical cord compression. Dr. Boyd also testified that the pattern of inflammation seen in the placental tissues is consistent with maternal inflammation, likely due to the documented presence of meconium (fecal material) in the diminished amniotic fluid in the hours prior to delivery and inconsistent with fetal inflammation as suggested by the Government.

Andrew W. Zimmerman, M.D., pediatric neurologist, also explained the relationship between oligohydramnios and umbilical cord compression, and testified that there is no doubt in his mind that lack of oxygen due to placental insufficiency and umbilical cord compression caused the injury in this case. Dr. Zimmerman also testified that the evidence does not support the idea that the injury was due to FIRS. Specifically, Dr. Zimmerman cited a lack of evidence of infection, such as no chorioamnionitis, negative cultures, no sepsis work-up or lumbar puncture and no diagnosis of infection by any clinician at Mercy or the University of Chicago. Dr. Zimmerman also testified that FIRS is not mentioned anywhere in the medical records.

Robert A. Zimmerman, M.D., pediatric neuroradiologist, explained that the radiologic images demonstrate an acute profound injury pattern consistent with lack of oxygen due to umbilical cord compression. Dr. Zimmerman also testified that if the injury were the result of fetal inflammatory response, there would have been more "white matter" injury rather than the "grey matter" injury seen in this case.

The Government called Patrick D. Barnes, M.D., pediatric neuroradiologist at Lucille Packard Children's Hospital, affiliated with Stanford University, who admitted that the images in this case are "pretty close" to a classic fetal asphyxia. Even though he did not have an opinion to a reasonable degree of certainty as to the cause of the injury, his "top choice" was hypoxia, or lack of oxygen. Also, Dr. Barnes acknowledged that FIRS is "controversial."

The Government also presented the testimony of John M. Freeman, M.D., retired pediatric neurologist formerly at The Johns Hopkins Medical Center, by way of deposition. Dr. Freeman acknowledged that the cause of injury was lack of oxygen, particularly in the 30 or 40 minutes immediately prior to delivery. He did not testify that the cause of the injury was FIRS.

The only witness the Government called to testify as to FIRS was O. Richard Depp, III, M.D., retired obstetrician-gynecologist and former director of maternal-fetal medicine at Prentice Women's Hospital, affiliated with Northwestern Memorial Hospital in Chicago. Dr. Depp acknowledged that he does not currently hold a license to practice medicine in any state and has not delivered a baby since at least 2001. He also acknowledged that as an obstetrician, his care for a fetus ends upon delivery and he therefore has never diagnosed or treated a baby with either hypoxic ischemic encephalopathy or FIRS. However, the Court recognizes Dr. Depp's long career practicing medicine and considered his testimony. Though Dr. Depp explained FIRS and how it might cause injury, he did acknowledge that both Plaintiffs' and the Government's placental pathologists ruled-out infection/chorioamnionitis. Dr. Depp also acknowledged that FIRS was never diagnosed or even mentioned in any of the medical records at Mercy or the University of Chicago.

After considering the evidence, the Court does not find Dr. Depp's testimony regarding FIRS to be credible. It is clear to the Court that the most credible explanation for what happened in this case is that the baby suffered lack of oxygen due to umbilical cord compression. Had the baby been admitted for continuous fetal monitoring and induction of labor following the office exam of January 10, 2005, the injury likely would not have occurred. Similarly, had the emergency C-section been performed within

15-20 minutes of the onset of bradycardia, it is more likely than not that the injury would not have occurred.

## V. DAMAGES

Having found breaches of the standard of care which were causative of the outcome, the Court must turn its attention to the question of damages.

There is no question that Braulio now suffers cerebral palsy with spastic quadriplegia. His limbs are contorted and he experiences painful contractures. He will never walk normally or talk normally. He is literally trapped in a body that he cannot control. He will be undergoing surgery shortly to help realign his hips and legs. He wears various orthopedic braces on his hands, arms and legs, and he will require various forms of therapy for the rest of his life. He is partially fed through a tube inserted into his stomach. He also developed a seizure disorder, and has made several trips to the emergency department for seizures in the last year. He requires medication to help control his seizures, which are monitored and adjusted by his pediatric neurologist. He will never be able to work or generate income.

In sum, this is a 5 year-old child who has experienced and will continue to experience complete loss of a normal life, pain and suffering and disfigurement. The costs to care for this child are and will continue to be substantial.

Plaintiffs called Gary M. Yarkony, M.D., rehabilitation medicine physician and professor at the Chicago Medical School to testify as to Braulio's condition and offer a medical and life care plan for the future. Dr. Yarkony, who is board certified in physical medicine and rehabilitation and has been in practice for nearly 30 years, testified that he has treated many patients such as Braulio and is familiar with their care needs. In addition to reviewing the medical records, Dr. Yarkony physically examined Braulio two times and also interviewed his parents and met with the family in their home. Dr. Yarkony determined that Braulio has cognitive dysfunction, impaired communication and partial paralysis of all four extremities and will require 24-hour assistance and supervision. Dr. Yarkony prepared a care plan delineating Braulio's care needs and their associated costs.

The Government called Ann Lovegrove, R.N., a nurse and life care planner who prepared an alternative care plan. While Nurse Lovegrove did review the medical records, she acknowledged that she had never seen nor examined Braulio, neither met with nor interviewed his parents and had never been to their home. She also acknowledged that she has not provided any clinical nursing care to any patient in the last 30 years. Though there is no doubt that Nurse Lovegrove is a competent life care planner, the Court accepts Dr. Yarkony's care plan based upon his superior credentials, experience and actual interaction with the child and his family.

Dr. Yarkony also testified that with proper medical care and assistance, Braulio will likely achieve a statistically normal life expectancy which, at the time of trial, would be 71.8 additional years of life based upon the uncontested life tables submitted into evidence. Deborah Stracco, Braulio's certified physical therapist at LaRabida Children's Hospital who has treated children with cerebral palsy for 25 years testified that Braulio can take food by mouth, scoot across a floor and has some verbal communication, all important factors in assessing life expectancy. She also testified that Braulio is an excellent candidate for good long-term outcome by virtue of his cognition, mobility and family support.

The Government offered the opinion of Dr. Freeman that Braulio would not likely live more than 15 additional years. Again, however, Dr. Freeman, who did not testify live at trial but whose deposition was submitted, acknowledged that he had never seen nor examined Braulio, neither met with nor interviewed his parents and had never been to their home. Also, Dr. Freeman did not know whether Braulio can take food by mouth, scoot across a floor or has some verbal communication, all important factors in assessing life expectancy. Finally, Dr. Freeman acknowledged that some of the literature upon which he based his opinion came under criticism, was found to have some flaws and in some cases relied upon data from more than 50 years ago. The Court finds Dr. Yarkony's assessment to be more credible and accepts his finding of a statistically normal life expectancy with proper medical care and assistance.

Plaintiffs called Roger B. Skurski, Ph.D., economist and professor emeritus at the University of Notre Dame to calculate the present value of Braulio's claim for lost wages and future care. Dr. Skurski submitted a report detailing his calculations and testified as to his methodology at trial.

As to the claim for a lifetime of lost wages, Dr. Skurski testified that an amount may be determined based upon an assessment of the parents' education and prediction of the level of education the child would have attained had the injury not occurred. In this case, the Court finds that had Braulio not been injured, he would have had "some college" which, using the data submitted by Dr. Skurski, would represent a present value for a lifetime of lost wages in the amount of $1,964,081. This calculation was unrebutted and the Court awards this amount as the present value for a lifetime of lost wages.

As to the claim for future care, Dr. Skurski appended to his report tables calculating the present value of future care costs projected out to Braulio's life expectancy. It should be noted that there are tables for an upper and lower range to account for cost alternatives in Dr. Yarkony's care plan. Using the table for the lower range, the present value of costs projected 71 years from the time of trial, through the year 2080, are $19,275,977. The Court awards this amount as the present value of future care costs.

With respect to non-economic damages such as loss of a normal life, disfigurement and pain and suffering, the Court is mindful that the 7th Circuit Court of Appeals has urged trial courts to consider comparable damage awards in similar cases. *See Jutzi-Johnson v. U.S.*, 263 F.3d 753, 759 (7th Cir. 2001). The parties each submitted reports of verdicts and settlements in similar cases and the Court has reviewed these reports to help determine an appropriate amount to award for the non-economic damages in this case.

Evidence of loss of a normal life, disfigurement and pain and suffering is substantial and uncontested. Based upon all of the evidence presented at trial, the Court awards $2,000,000 for pain and suffering, $5,000,000 for loss of a normal life, and $2,000,000 for disfigurement.

Plaintiffs also submitted a claim for shortened life expectancy. However, because the Court finds that Braulio is likely to achieve a statistically normal life expectancy, the Court makes no award for shortened life expectancy.

Therefore, judgment is entered in favor of Plaintiffs and against the Defendant in the amount of $30,240,058.00, plus costs.

ENTERED: January 25, 2010

Honorable Wayne R. Andersen